# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| **SALVATORE A. FAMULARE,** | Case No. 3:18 CV 2518 |
| Plaintiff, | Judge James G. Carr |
| v. | Magistrate Judge James R. Knepp II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | **REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Salvatore Famulare ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated October 31, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in March 2016, alleging a disability onset date of April 9, 2013. (Tr. 171-72). His claims were denied initially and upon reconsideration. (Tr. 99-100, 104-06). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 111-12). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on November 29, 2017. (Tr. 31-71). On May 1, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-26). The Appeals Council denied Plaintiff's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 41.955, 404.981. Plaintiff timely filed the instant action on October 31, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in 1973, making him 44 years old on the date of his hearing. *See* Tr. 171. He had past work as a short order cook. (Tr. 37-38). Plaintiff alleged disability due to bilateral lower extremity fractures, limited mobility, right ankle pain, and an inability to sit for long periods (Tr. 72), resulting from a workplace accident where he fell off a ladder on April 9, 2013 (the alleged disability onset date) (Tr. 36-37, 51).

Between his alleged onset date and February 2017, Plaintiff worked twenty hours per week as a short order cook at a motel (Tr. 39-40), usually working these hours on three consecutive days (Tr. 56-57). Plaintiff stood for 45 minutes while working, but experienced "a lot" of pain and, by his third workday, was using a walker in the winter. (Tr. 51-52). He left the job because he had ankle fusion surgery. (Tr. 39). Plaintiff believed he was no longer able to work because he recently completed half of his rehabilitation therapy and he was "just now" getting back to the ability to stand for 45 minutes at a time. (Tr. 39-40, 51-52). He did not "believe [he] could stand eight hours at a time, let alone move and all things that are required in the kitchen." (Tr. 40). Plaintiff added that, even around the house, his friends "pretty much take care of all the household work" because he experienced "extreme swelling" and "pressure in [his] feet and ankles" that made him "feel like the toes are going to just pop off [his] feet." *Id*. He noted that his right ankle "is the biggest problem right now" but added that he still had "several pins and a plate holding [his] left knee together". *Id*.

2

Plaintiff estimated the farthest distance he could walk was to his mother's home, directly next door. (Tr. 44). The ALJ reminded Plaintiff that, earlier in the hearing, he stated he could be on his feet for 45 minutes. *Id*. Plaintiff replied "[t]hat's in therapy. That's upright on my feet. Yes, ma'am. But as far as how far I could walk, I don't generally do it." (Tr. 45). Plaintiff noted he could lift ten to fifteen pounds in therapy. *Id*. When asked if he could bend over and grab a dollar from under the couch, Plaintiff stated he could, but would "usually sit down to get it". *Id*. Plaintiff estimated that he could not perform a job, seated for eight hours per day, sorting a pile of nuts and bolts because he elevated his legs frequently "to alleviate the pain and swelling." (Tr. 46). When asked if he could perform a job where he was required to stand two hours total in an eight-hour workday, Plaintiff replied, "I don't know. I mean I guess it would depend on the job." (Tr. 54). He stated he was unable to stoop, kneel, or crawl. (Tr. 55).

Plaintiff wore a brace on his left ankle and circulation sock on his right leg. (Tr. 47). He also wore a sleeve over his left knee. *Id*. Plaintiff used a walker "mostly in the winter time" due to "the cold and the pain, plus work". (Tr. 53). He used the walker at home, not while he worked. *Id*.

Plaintiff attended physical therapy three days per week. (Tr. 47). There, he worked on maintaining his balance and increasing his leg strength. *Id*. When asked about his prognosis, Plaintiff stated he was told "maybe six more months of healing was needed". (Tr. 48).

Plaintiff experienced some pain relief from his ankle surgery. *Id.* He estimated that his ankle pain would be a ten after three days of work, and a four or five daily but increased if he exerted himself. (Tr. 48-49).

Plaintiff lived alone. (Tr. 36). In a typical day, he ate breakfast, let the dog out, walked down to his basement to do laundry, watched television, and visited with friends. (Tr. 45). He also added that he took care of his 85-year-old mother who had dementia, though his brother was her

primary caregiver. (Tr. 45-46). Plaintiff drove himself, including to the hearing, but "use[d] cruise control for everything" because it was "easier on [his] legs". (Tr. 36).

Relevant Medical Evidence

 On April 9, 2013, Plaintiff fell approximately twelve feet from a rooftop. (Tr. 268). He treated at the emergency room immediately following for a right open pilon fracture, right distal fibula fracture, and left tibial plateau fracture. (Tr. 268, 271). The same day, Plaintiff underwent an irrigation and debridement of his open fracture and placement of staged external fixators in his right and left lower extremities. (Tr. 273). He was discharged on April 12, 2013 with orders to be "[n]onweightbearing to the left lower extremity". (Tr. 248). Plaintiff was admitted into an in-patient rehabilitation facility on April 26, 2013 (Tr. 540), where he remained until July 11, 2013 (Tr. 641).

Plaintiff saw orthopedist Joseph Weber, D.O., in May 2013. (Tr. 1211). Dr. Weber reported Plaintiff was "doing well" while still in the rehabilitation facility with well-controlled pain. *Id*. Dr. Weber noted Plaintiff was non-weightbearing in both lower extremities, out of his knee brace (other than for comfort), out of his right splint, and had his sutures and staples removed. *Id*. He was to continue physical therapy to improve his range of motion. *Id*. Later that month, Plaintiff complained of pain in his right ankle and left knee. (Tr. 1214). On examination, Plaintiff had mild erythema and moderate swelling with decreased range of motion in his right ankle. *Id*.

Plaintiff continued physical therapy at Bellevue Hospital on July 24, 2013 and underwent an ambulatory assessment at intake where records indicate he was ambulating with a rolling walker and could not wear shoes due to "constant swelling". (Tr. 705). He was still relying on the rolling walker at a session on August 6. (Tr. 721).

Plaintiff saw Dr. Weber monthly from June through October 2013. *See* Tr. 424, 426, 781, 1218-19, 1226. Throughout this period, Plaintiff had continued pain in his right ankle and used a walker, weightbearing as tolerated. (Tr. 426, 781, 1226). By October, Plaintiff had "healed well" from his left leg injury, but "had delayed union of the right pilon fracture". (Tr. 424). Dr. Weber concluded Plaintiff's "[f]ractures have clinically and radiographically healed." *Id*. He continued to have "dull achy pain" in his right ankle but was able to bear weight on it. *Id*.

Plaintiff treated with his primary care physician, Douglas Hoy, M.D., in February 2014. (Tr. 1140-41). He reported that he was "[p]ain wise . . . pretty good" with "good days and bad days". (Tr. 1140). Plaintiff noted his right leg throbbed from knee to ankle. *Id*. The "Physical Exam" section of this record is blank. *Id*.

Plaintiff returned to Dr. Weber in October 2014 reporting that he returned to work as a chef. (Tr. 423). He noted pain in his right ankle and swelling in his left knee, but stated his ankle did not hurt if he was not working. *Id*. On examination, Dr. Weber noted Plaintiff's right ankle was tender to palpation, he had weak inversion with pain, and a painful right single heel raise at the medial ankle. *Id*. Plaintiff also had pain with full extension of his left knee, was nontender to palpation, and had intact sensation to light touch. *Id*. Dr. Weber recommended he rest and ice his ankle as well as wear an ankle brace with supportive shoes. *Id*.

Plaintiff treated with Dr. Hoy in May 2014. (Tr. 1137). He reported that his right ankle swelled when he was "on it" and the "pain [was] bad but some days doesn't bother [him] at all." *Id*. There are no physical examination notes in this record. *Id*. Plaintiff noted he still had a "pulsing sensation" in the ankle. *Id*. In June, Plaintiff noted that, after performing activities of daily living for a "couple days", he was unable to walk on the third day. (Tr. 1268). He told Dr. Hoy that he still experienced swelling in his ankle and needed Percocet for pain control; his pain was worse

when active. *Id*. On examination, Plaintiff had limited range of motion and tenderness in his right ankle; he also had swelling "despite short compression stock[]ing". *Id*. By August, Plaintiff was "up on" his ankle more, but still experienced pain and swelling in his left knee and right ankle. (Tr. 1266). Plaintiff had tenderness in his left knee on examination. *Id*. In October, Plaintiff reported his pain was "constant" and "worse with walking". (Tr. 1264). On examination, Dr. Hoy noted swelling in both legs and right ankle tenderness with stretching. *Id*.

Plaintiff returned to Dr. Hoy in January 2015 reporting pain and weakness in both legs. (Tr. 967). He noted that if he worked more than eight hours, he "need[ed] to rest for about 24 hours before [he] improved and can repeat." *Id*. On examination, Dr. Hoy found Plaintiff had limited range of motion in his right ankle and a positive straight leg raise, with worsening pain during forced extension. *Id*. Plaintiff saw Dr. Hoy twice in April 2015. (Tr. 1273-77). He reported working Friday through Sunday with "severe" pain in his back and legs. (Tr. 1273). Later that month, he reported his pain was "somewhat better" but "still very bad after working". (Tr. 1276). Plaintiff had positive straight leg raises bilaterally during one visit (Tr. 1273), and on his right side only during another (Tr. 1276). In July, Plaintiff again reported his pain was "somewhat better" but "still very bad after working". (Tr. 1283). If he worked more than three days in a row, he was "back to wal[k]ing with a walker." *Id*. Plaintiff had a slow antalgic gait on examination. *Id*.

Plaintiff continued to treat with Dr. Hoy from September 2015 through April 2016. *See* Tr. 1290-1297, 1308-10. Plaintiff reported ongoing pain, especially after working the weekends; he often needed a break on Mondays to recover. (Tr. 1308); *see also* Tr. 1290 ("20 hours is max a[t] work – still with severe pain after work and next 1-2 days"); Tr. 1293 (Plaintiff able to work "some", and would "[w]ork 3 days then ne[e]ds 4 days off to get back to his baseline."); Tr. 1295 (Plaintiff "can work 20 hours a week but needs to have breaks in between days."). Plaintiff had

6

poor range of motion in his right ankle in September 2015 (Tr. 1293), but had "decent" range of motion in November because he had been off-work the two days prior (Tr. 1290). In February 2016, Dr. Hoy noted Plaintiff had some swelling in his left upper calf (non-pitting). (Tr. 1295). In April, Plaintiff reported continued pain, that he needed a cane by Sunday afternoon, and "20 hours per week is all [he] can work." (Tr. 1308). There were no physical examination findings listed for this visit. (Tr. 1308-09).

Plaintiff returned to Dr. Weber in May 2016 for increasing pain in his right ankle. (Tr. 1299-1300). On examination, Dr. Weber found Plaintiff's ankle was tender to palpation with no erythema or swelling. (Tr. 1300). X-rays taken during the visit revealed "well healed" fractures of the distal tibia and fibular shaft with stable, in place, hardware. *Id*. There were "severe signs" of arthritis present in the ankle mortise with cystic changes in the distal fibula and "almost complete loss of the ankle mortise joint space." *Id*. Dr. Weber provided a steroid injection during the visit. *Id*.

Plaintiff attended a pain management consultation with Vimal, Kumar, M.D., in May 2016. (Tr. 1315-16). Though his pain was 0/10 during the visit – eight days after the steroid injection from Dr. Weber – Plaintiff reported "crushing" pain exacerbated by standing or walking for any length of time. (Tr. 1315). He had "significant difficulty" with the pain when working in the restaurant on the weekends. *Id*. Plaintiff had deceased range of motion on examination with increased tenderness along the proximal joint. (Tr. 1315). Dr. Kumar recommended adding Epsom salt soaks and Osteo Bi-Flex ointment to his regimen. (Tr. 1315-16).

X-rays taken in August 2016 revealed age advanced degenerative osteoarthritis with underlying chronic posttraumatic changes. (Tr. 1331).

Plaintiff treated with podiatrist Peter Highlander, D.P.M., in November 2016. (Tr. 1533-35). Plaintiff reported "constant" pain which he described as "sharp, stabbing, throbbing"; he rated his pain at 4/10 during the appointment. (Tr. 1533). On examination, Plaintiff had pain on palpation over the anterior ankle joint with limited range of motion, crepitus, and a valgus deformity of the ankle. (Tr. 1535). Dr. Highlander diagnosed pain and post-traumatic arthritis of the right ankle and ordered a CT scan. *Id*.

Results of the CT scan demonstrated extensive posttraumatic and surgical changes which were grossly stable. (Tr. 1348). There was also complete loss of the ankle joint space with bone-on-bone articulation, subchondral cysts, and suspected osteochondral defects within the tibial plafond. *Id*.

Plaintiff returned to Dr. Highlander again monthly from December 2016 through February 2017. (Tr. 1538-40, 1541-43, 1544-46). Plaintiff reported his symptoms had worsened and Dr. Highlander recommended surgical intervention. (Tr. 1540). Because Dr. Highlander thought Plaintiff was not a good candidate for a full ankle replacement, he recommended an ankle fusion. (Tr. 1540, 1543, 1546).

Dr. Highlander performed the right ankle fusion and hardware removal in February 2017. (Tr. 1403-04). At Plaintiff's first postoperative appointment, Dr. Highlander noted Plaintiff was "doing very well"; he prescribed a short, well-padded, non-weightbearing cast and a knee scooter. (Tr. 1554). Dr. Highlander ordered Plaintiff to continue non-weightbearing and elevate his ankle with ice. *Id*. In March, Plaintiff was placed in a CAM boot and ordered to continue non-weightbearing with no motion to the ankle or foot. (Tr. 1558). In April, Dr. Highlander ordered Plaintiff to progress to weightbearing as tolerated in the CAM boot for two to three weeks and, at that time, could transition out of the boot into an ASO ankle brace. (Tr. 1562). In May, Plaintiff

8

had transitioned to normal shoes with the ASO ankle brace, which Dr. Highlander stated he could discontinue "at his discretion". (Tr. 1565). By July, Plaintiff was noted to be "doing very well and continuing to progress as expected". (Tr. 1569). Dr. Highlander believed it would be six months before Plaintiff reached maximum medical benefit; he opined Plaintiff would always have some ankle pain, but was unsure as to what degree. *Id*. He recommended Plaintiff continue wearing his ASO ankle brace and compression stockings and follow-up with a pain center. *Id*.

Plaintiff returned to Dr. Hoy in June and July 2017. (Tr. 1361, 1573). In June, Plaintiff reported swelling in his right ankle but that his pain was "some better". (Tr. 1361). On examination, Dr. Hoy noted "some" swelling with no erythema. *Id*. In July, Plaintiff reported erythema and swelling which "goes away"; he had pain with activity but was "not in bad pain" when "do[ing] nothing". (Tr. 1573). Plaintiff did not have the strength to work more than two days due to pain with standing. *Id*. On examination, Plaintiff had swelling in both legs, right greater than left. *Id*. Plaintiff repeated these symptoms to Dr. Hoy in August, adding that he was unable to work 40 hours and doubted he would ever be able to. (Tr. 1578). Dr. Hoy did not note any physical findings regarding Plaintiff's ankle at this visit. (Tr. 1579).

In September, Dr. Highlander noted Plaintiff was weightbearing in supportive shoes with an unsteady gait. (Tr. 1581). Plaintiff stated his pain and swelling continued to worsen with weightbearing activity. *Id*. He felt like his anterior ankle bones were "moving around". *Id*. Dr. Highlander noted Plaintiff did not have any significant deformity when he stood; he had no available range of motion in his ankle joint. (Tr. 1583). He further noted Plaintiff had decreased pace and cadence with an antalgic limp to the right side. *Id*.

Opinion Evidence

*Treating Physicians*

Dr. Hoy provided a "Physician's Report of Work Ability" for the Ohio Bureau of Workers' Compensation in February 2014. (Tr. 1258-59). Dr. Hoy opined Plaintiff could work three hours per day for a total of twelve hours per week. (Tr. 1258). Plaintiff could perform repetitive actions with both feet in order to operate foot controls or a motor vehicle; he could also safely operate heavy machinery or drive while taking his prescribed medications. *Id*. Dr. Hoy opined Plaintiff could lift/carry eleven to twenty pounds occasionally and never lift anything greater. *Id*. Plaintiff could occasionally push/pull thirteen to 25 pounds, but nothing greater. *Id*. He could occasionally bend, twist/turn, and climb. *Id*. Plaintiff could never squat or kneel. *Id*. He could frequently drive (either an automatic or standard shift vehicle). *Id*. Finally, Dr. Hoy opined Plaintiff could sit for two hours total in an eight-hour workday (with breaks), walk for one hour (with breaks), and stand for two hours total (with breaks). *Id*.

In September 2017, Dr. Highlander opined that "[g]iven his manual labor job description [I] believe it'll be very difficult for him to return to the same capacity at work without being at a higher risk for further injury given his lack of flexibility and balance associated with ankle fusion." (Tr. 1583). Further, he noted "I do think it is reasonable [that] the patient return to work with a job description consistent with sedentary job duties such as desk work which would require minimal time on his feet." *Id*.

Dr. Highlander completed a physical residual functional capacity report in October 2017. (Tr. 1586-88). He opined Plaintiff could walk one city block without rest or severe pain; he could sit for more than two hours at a time before needing to get up, and stand for twenty minutes at a time before needing to sit down. (Tr. 1586). Plaintiff could stand for less than two hours, and sit

for at least six hours, of an eight-hour workday. *Id*. He needed a job that permitted unscheduled breaks and the ability to shift positions at will from sitting, standing, or walking. *Id*. Dr. Highlander opined Plaintiff needed to elevate his legs for 25% of an eight-hour workday if he had a sedentary job. *Id*. He did not require the use of a cane or other assistive device when engaging in occasional standing/walking. (Tr. 1587). Dr. Highlander found Plaintiff's pain was frequently[1] severe enough to interfere with his attention and concentration. *Id*. Plaintiff could frequently lift ten pounds or less, rarely[2] lift twenty pounds, and never (or rarely) lift fifty pounds. *Id*. He could never stoop or bend, crouch or squat, balance, or climb ladders; Plaintiff could rarely climb stairs or kneel, and occasionally[3] twist or crawl. *Id*. Plaintiff's impairments were likely to produce "good days" and "bad days" and he would likely be absent from work approximately four days per month. *Id*. Finally, Dr. Highlander opined Plaintiff needed to avoid heights and moving machinery. (Tr. 1588).

*State Agency Physicians*

State agency physician Maureen Gallagher, D.O., M.P.H., offered a physical residual functional capacity assessment in March 2016. (Tr. 79-82). She concluded that – beginning November 22, 2013 – Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand or walk for a total of four hours, and sit for about six hours in an eight-hour workday. (Tr. 80). He was limited to "occasional light push/pull" in his right lower extremity. *Id*. Dr. Gallagher opined Plaintiff could occasionally climb ramps/stairs, stoop, crouch, or kneel. *Id*. Plaintiff could never crawl or climb ladders, ropes, or scaffolds. *Id*. He could frequently balance.

---

1. The form defines "frequently" as "34% to 66% of an 8-hour working day." (Tr. 1587).

2. The form defines "rarely" as "1% to 5% of an 8-hour working day." (Tr. 1587).

3. The form defines "occasionally" as "6% to 33% of an 8-hour working day." (Tr. 1587).

*Id.* Finally, she concluded Plaintiff needed to avoid all exposure to hazards such as machinery or heights. (Tr. 81).

In August 2016, State agency physician William Bolz, M.D., concurred with Dr. Gallagher's findings. (Tr. 92-94).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 60-71. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was limited in the way in which the ALJ determined Plaintiff to be. *See* Tr. 62-65. The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as an optical goods worker, a semiconductor industry worker, or a medical assembly worker. (Tr. 65-66).

ALJ Decision

In a written decision dated May 1, 2018, the ALJ found Plaintiff met the insured status requirements for DIB through September 30, 2021 and had not engaged in substantial gainful activity since his alleged onset date (April 9, 2013). (Tr. 17). She concluded Plaintiff had severe impairments of: status post-pilon fracture of the right tibia, posttraumatic arthritis of the right ankle, and obesity, but found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 17-18). The ALJ then found Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a). The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. In addition, the claimant can never work at unprotected heights or around moving dangerous mechanical parts, and he can never work in conditions of extreme cold. He is limited to a sit stand option at the workstation to change position for two minutes while remaining on task 90 percent of the time.

(Tr. 18-19). The ALJ found Plaintiff was unable to perform past relevant work. (Tr. 24) He was "a younger individual" on the alleged onset date and had at least a high school education. (Tr. 25). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* Thus, the ALJ found Plaintiff not disabled from the alleged onset date through the date of the decision. (Tr. 26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two objections to the ALJ's decision. First, he contends the ALJ erred at Step Three by not providing an "acceptable analysis" of Listing 1.02. (Doc. 13, at 16). Second, Plaintiff alleges the ALJ erred in her analysis of the medical opinion evidence. *Id.* at 21-29. The

14

Commissioner responds that the ALJ's decision is supported by substantial evidence. For the following reasons, the undersigned recommends ALJ's decision be affirmed in its entirety.

<u>Step Three</u>

Plaintiff first argues the ALJ erred in her analysis of Listing 1.02. Specifically, Plaintiff contends the ALJ's explanation of whether or not he met (or equaled) the Listing was deficient because it was too brief and "failed to comport with applicable requirements and standards." (Doc. 13, at 17). The Commissioner responds that the ALJ's analysis is supported by substantial evidence. (Doc. 16, at 5-9). For the following reasons, the undersigned finds no error and recommends the ALJ's decision be affirmed in this regard.

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at Step Three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). Moreover, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

Further, the ALJ must "actually evaluate the evidence, compare it to [the applicable] Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). As the Sixth Circuit has explained, however, *Reynolds* does not require remand unless the claimant can "point to specific

evidence that demonstrates he reasonably could meet or equal every requirement of the [L]isting"

and "[a]bsent such evidence, the ALJ does not commit reversible error by failing to evaluate a

[L]isting at Step Three." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir.

2014) (distinguishing *Reynolds*; internal citations omitted); *see also Forrest v. Comm'r of Soc.

Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (remand not required where claimant "has not shown

that his impairments met or medically equaled in severity any listed impairment"; distinguishing

*Reynolds*). Thus, in instances where the ALJ does not evaluate a Listing, the court must "determine

whether the record evidence raises a substantial question as to [Plaintiff's] ability to satisfy each

requirement of the [L]isting." *Smith-Johnson*, 579 F. App'x at 432; *see also Sheeks v. Comm'r of

Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013) ("A substantial question about whether a claimant

meets a [L]isting requires more than . . . a mere toehold in the record on an essential element of

the [L]isting.").

To establish disability based on a major dysfunction of a joint under Listing 1.02, Plaintiff

must establish:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion
> or other abnormal motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder,
> elbow, or wrist-hand), resulting in inability to perform fine and gross movements
> effectively, as defined in 1.00B2c.

16

20 C.F.R. Pt. 404, Subpt. P, Listing 1.02. The "inability to ambulate effectively" referenced in

1.02(A), provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, Listing 1.00(B)(2)(b)(1)-(2). In addition, the regulations provide that

"[t]he inability to ambulate effectively or the inability to perform fine and gross movements

effectively must have lasted, or be expected to last, for at least 12 months." Listing 1.00(B)(2)(a).

Here, the ALJ determined Plaintiff did not meet the requirements of Listing 1.02. She

explained:

> The claimant's impairments fail to meet or equal Listing 1.02 (Major dysfunction of a joint(s) (due to any cause)). The record, consistent with the findings below, does not demonstrate gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints involving one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively.

(Tr. 18). In so concluding, the ALJ went through each of the Listing's requirements and

reasonably determined that, "consistent with the findings below", Plaintiff did not meet (or

17

equal) Listing 1.02. *Id*. Then, immediately "below", the ALJ set forth six pages of evidentiary analysis which she incorporated by reference. *See* Tr. 19-24; *see also Forrest v. Comm'r of Soc. Sec*., 591 F. App'x 359, 366 (6th Cir. 2014) (upholding an ALJ's analysis at Step Three where "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding an ALJ's Step Three analysis supported "even though he did not spell out every fact a second time under the step three analysis").

The ALJ also clearly considered Plaintiff's ability to ambulate. For example, she cited Plaintiff's testimony that he lived alone, drove a car (with cruise control), prepared his own meals, did his laundry, visited friends, and cared for his mother who had dementia. (Tr. 20). Relatedly, the ALJ noted that, while Plaintiff reported ongoing pain, it was generally attributed to him working several days in a row as a chef. (Tr. 21) (citing Tr. 898 (Plaintiff reported pain while working but noted his ankle did not hurt if he was not working); Tr. 967 (Dr. Hoy's notation that Plaintiff had "pain and weakness in[] both legs – IF does more than 8 hours – needs to rest for about 24 hours before improved and can repeat."); Tr. 1276, 1283 (Plaintiff reported "very bad" pain after working); Tr. 1308 (Plaintiff reported working weekends (up to 20 hours per week), but "used [a] cane by Sunday afternoon")). Further, she noted that Plaintiff reported using a walker at home to ambulate, but did not use it at his part time job. (Tr. 19).

As evidence he meets Listing 1.02(A), Plaintiff points to instances where he experienced severe pain and limited range of motion. (Doc. 13, at 20-21). As evidence he could not ambulate effectively, Plaintiff points to his sporadic post-operative use of a walker and knee roller; arguing that, even when he did not require an assistive device, he complained of pain and swelling. *Id*. at 21. The undersigned concludes citation to these sporadic events does not satisfy Plaintiff's burden

of showing a "substantial question" as to whether he meets Listing 1.02 as necessary to obtain a remand, especially with his inability to ambulate effectively. *Smith-Johnson*, 579 F. App'x at 432; *Sheeks*, 544 F. App'x at 642. Again, Plaintiff is required to "point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the [L]isting." *Smith-Johnson*, 579 F. App'x at 432. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a [L]isting at Step Three." *Id.* at 433. The same rationale logically applies to an allegedly incorrect evaluation of a Listing as it does to the failure to address a Listing. For these reasons, the undersigned finds no error at Step Three and recommends the decision be affirmed in this regard.

Opinion Evidence

Next, Plaintiff asserts the RFC is unsupported because the ALJ failed to properly consider the opinions of his two treating physicians, Drs. Hoy and Highlander, and the two State agency physicians, Drs. Gallagher and Bolz. For the following reasons, the undersigned finds no error and recommends the ALJ's decision be affirmed as to each physician.

*Treating Physicians*

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[4] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective

---

4. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2))

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, when the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Id.* (quoting 20 C.F.R. § 416.927(d)(2)). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544 (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, she is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Hoy*

In evaluating Dr. Hoy's opinion, the ALJ explained:

The undersigned assigned partial weight to the opinions of Dr. Hoy, as he is a treating source physician who had an opportunity to observe the claimant over time. However, Dr. Hoy was the claimant's primary care physician, as opposed to one of the claimant's surgeons, and his treatment notes consist primarily of the claimant's

subjective complaints, as opposed to objective medical findings that would support the limitations addressed in his opinion. In fact, Dr. Hoy noted some improvement over time (see, e.g., Ex. 3F/287, 290; Ex. 10F/36; Ex. 13F/33). Also of note, while Dr. Hoy opined that the claimant could not sit, stand or walk for more than 2 hours in an 8-hour workday, there are numerous references to the claimant working as a chef several days per week in excess of these restrictions (Ex. 3F/46, 117; Ex. 7F/32, 39; Ex. 9F/4). Furthermore, the determination as to whether the claimant is disabled is an opinion reserved for the Commissioner (20 CFR 404.1527(d) and 416.927(d)). Thus, the undersigned refrained from assigning additional weight to Dr. Hoy's opinion.

(Tr. 22). The undersigned finds this analysis by the ALJ implicates several of the required "good reasons" when assigning less than controlling weight to Dr. Hoy's opinion and those reasons are supported by substantial evidence. First, the ALJ reasonably considered the length of Dr. Hoy's treating relationship and the nature of his practice – general medicine as opposed to orthopedics. *Id*. While Plaintiff alleges this is error, length of the treating relationship and the provider's specialty are both factors an ALJ properly considers when assigning weight to a treating source. *See* 20 C.F.R. § 404.1527(c)(2)(i); 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). The ALJ next noted that Dr. Hoy's treatment notes consisted primarily of Plaintiff's subjective complaints, as opposed to objective findings that would support his opinion. (Tr. 22). This is also a proper consideration. *See Keeler v. Comm'r of Soc. Sec.,* 511 F. App'x 472, 473 (6th Cir. 2013) (upholding ALJ's decision to decline to assign controlling weight to a treating source where the opinion was was based primarily on a plaintiff's subjective symptoms).  The ALJ's assessment is supported here where Dr. Hoy offered some physical examination findings, but they were often minimal and interspersed with times where he offered no physical examination findings at all. *See* Tr. 1137 (Dr. Hoy's visit note where the physical examination section was left blank); Tr. 1140 (same); Tr. 1308-09 (same); Tr. 1579 (no physical examination of the knee of ankle); Tr. 1259 (Dr. Hoy's opinion where he

lists "poor balance" and "knee pain" as his clinical and objective findings in support of his limitations).

Finally, the ALJ made the supported observation that, while Dr. Hoy opined Plaintiff could not sit, stand or walk for more than 2 hours in an 8-hour workday, there were numerous references to his working as a chef several days per week in excess of these restrictions. (Tr. 22). Plaintiff contends this is unsupported because "at no time throughout the pertinent period [did] Dr. Hoy's records demonstrate that Plaintiff was working 'several days per week as a chef'". (Doc. 13, at 25). However, Dr. Hoy opined Plaintiff could only work three hours per day for a total of twelve hours per week. (Tr. 1258). And, as the ALJ noted, Dr. Hoy's his own treatment notes contradict Plaintiff's argument and clearly indicate he regularly worked in excess of this limitation. (Tr. 22) (citing Tr. 967 (Dr. Hoy's notation that Plaintiff had "pain and weakness in[] both legs – IF does more than 8 hours – needs to rest for about 24 hours before improved and can repeat."); Tr. 1273 (Plaintiff reporting he worked Friday, Saturday, and Sunday); Tr. 1283 (Plaintiff reporting that if he "works more than 3 days in a row – is back to walking with walker."); Tr. 1290 (Plaintiff reporting "20 hours is max a[t] work"); Tr. 1293 (Plaintiff reporting he is "ab[l]e to work some – works 3 days then ne[e]ds 4 days off to get back to his baseline."); Tr. 1295 (Plaintiff reporting he "can work 20 hours a week but needs to have breaks in between days.") Tr. 1308 (Plaintiff reporting "20 hours per week is all he can work.")). This conclusion – that Dr. Hoy's limitations were inconsistent with Plaintiff's self-report that he performed work in excess of such – directly implicates the factor of consistency, 20 C.F.R. § 404.1527(c)(4), and is a supported reason for discounting Dr. Hoy's opinion.

Thus, the undersigned finds the ALJ provided several "good reasons" to discount Dr. Hoy's opinion. These reasons are properly supported by the record and, as such, the undersigned finds no error.

> ### Dr. Highlander

The ALJ next evaluated the opinion of Dr. Highlander, explaining:

> The undersigned assigned some weight to Dr. Highlander's opinion. However, his November 2017 opinion includes limitations, such as the need for 4 absences from work per month and the need to elevate his legs 25 percent of the workday, that are not supported by the objective medical evidence of record; are at odds with his treatment notes, which show post-surgical improvement in the claimant's impairments; and are contradicted by his opinion that the claimant could return to sedentary work (Ex. 13F/36-38; Ex. 15F/3).

(Tr. 23). These reasons given by the ALJ to assign "some" weight to Dr. Highlander's opinion are also supported "good reasons" which directly implicate the factors of supportability and consistency. 20 C.F.R. § 404.1527(c)(3)-(4). The ALJ's conclusion is supported by the record which shows Dr. Highlander did indeed document post-operative improvement: Plaintiff graduated to a CAM boot one month post-operation in March (Tr. 1558), progressed to weightbearing activity in April (Tr. 1562), and transitioned to "normal" shoes by May (Tr. 1565). Dr. Highlander also reported Plaintiff was doing "very well" post-operatively. (Tr. 1554, 1569). *See Thomas v. Comm'r of Soc. Sec.*, 2013 WL 1283899, at *7 (N.D. Ohio) (finding improvement in symptoms a "good reason" for the ALJ's to discount a treating source's opinion); *Stump v. Comm'r of Soc. Sec.*, 2019 WL 4219276, at *1 (N.D. Ohio) (same). Finally, the ALJ's observation that Dr. Highlander's opined limitations (Tr. 1586), were inconsistent with his opinion that Plaintiff could return to sedentary work is also supported (which, the undersigned notes, was offered less than two weeks earlier). *See* Tr. 1583 ("I do think it is reasonable [that] the patient

return to work with a job description consistent with sedentary job duties such as desk work which would require minimal time on his feet.").

In support of his position, Plaintiff points to evidence supporting a contrary conclusion. (Doc. 13, at 26). However, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does so here and the undersigned recommends the ALJ's decision be affirmed in this regard.

*State Agency Physicians*

Next, Plaintiff alleges the ALJ's evaluation of the opinions from State agency reviewing physicians, Drs. Gallagher and Bolz, is legally insufficient because she assigned greater weight non-examining source opinion than to treating source opinion without sufficient explanation. (Doc. 13, at 27-28). Additionally, Plaintiff points out that both State agency physicians rendered their opinions without being privy to his subsequent treatment history. *Id*. For the following reasons, the undersigned finds no error and recommends the decision be affirmed.

As an initial matter, Plaintiff is correct that, under the regulations, there exists a hierarchy of medical opinions: first, is the treating source; second, is the non-treating source, one who has examined but not treated the plaintiff; and last, is a non-examining source, one who renders an opinion based on a review of the medical record as a whole. 20 C.F.R. § 404.1502. An ALJ must provide "good reasons" for the weight given to a treating source, *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004), but not for a non-treating or non-examining source, *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original); *Martin v. Comm'r of Soc. Sec.*,

24

658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions.").

In evaluating the opinions of Drs. Gallagher and Bolz, the ALJ explained:

> The undersigned assigned great weight to the opinions of Dr. Gallagher and Dr. Bolz, but based upon the claimant's subsequent surgery in February 2017 and his testimony regarding the effect of coldness on his pain, the undersigned limited the claimant to sedentary work with additional exertional limitations (Ex. 12F/2; Ex. 13F/12). In addition, based upon the claimant's testimony regarding his ability to drive, the undersigned refrained from adding the lower extremity push/pull limitation in the above residual functional capacity (Testimony).

(Tr. 23).

First, Plaintiff contends this evaluation is legally insufficient because the ALJ assigned greater weight to these non-examining sources than she did the treating sources. However, the Sixth Circuit has held that the regulations "do[] not instruct an ALJ to compare the consistency of treating and examining physicians' opinions to each other", instead, an ALJ is instructed "to compare the consistency of a physician's opinion to the *record as a whole.*" *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 441-42 (6th Cir. 2010) (emphasis in original). In other words, an ALJ is not instructed to weigh the opinions against each other and automatically assign treating sources greater weight than examining or non-examining, and so forth. The ALJ is instead tasked with examining the opinions *individually* and how they relate to the record as a whole. *Id.* As discussed above, the ALJ's analysis of the treating physicians is supported by substantial evidence. Thus, the ALJ's decision to assign greater weight to the non-examining source is not *per se* error.

As far as the ALJ's explanation for the weight assigned here, she was not required to delineate the heightened "good reasons" as she was with Plaintiff's treating sources, but her analysis must be supported. *Smith*, 482 F.3d at 876. Here, the ALJ gave great weight to the opinions of Drs. Gallagher and Bolz. (Tr. 23). Importantly here, Drs. Gallagher and Bolz found Plaintiff

capable of *light* work (Tr. 79-82, 92-94); 20 C.F.R. § 404.1567(b); however, the ALJ expressly recognized – just as Plaintiff suggested – that each physician was not privy to certain medical treatment post-dating their opinions. *Id.* ("[B]ut based upon the claimant's subsequent surgery in February 2017 and his testimony regarding the effect of coldness on his pain. . ."). After considering Plaintiff's testimony and his 2017 surgery, the ALJ then found Plaintiff *more limited* than Drs. Gallagher and Bolz, finding him capable of only sedentary work with additional limitations. *Id.*; Tr. 18-19 (RFC). Thus, Plaintiff's argument that the ALJ erred in assigning them more weight even though they did not examine the entire record is a moot point – the ALJ *expressly* considered the later dated records and placed *more* restriction on his activities than the physicians opined. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered later-dated evidence and any relevant changes in Plaintiff's condition). Plaintiff further argues it was "worthy to note" that the ALJ did not adopt the Drs. opinion related to the limited use of foot controls. (Doc. 13, at 27). However, the ALJ specifically addressed her reason for not doing so – that Plaintiff admitted that he could drive (using cruise control) in his later-dated testimony, even driving himself to the hearing. (Tr. 23) (citing Tr. 36). The ALJ's rationale is supported by Plaintiff's testimony as to his own abilities.

An ALJ is tasked with crafting an RFC after evaluating all of the record evidence, opinion and otherwise. 20 C.F.R. § 404.1545(a)(3). She did so here by creating an RFC that lies somewhere in between the State agency physicians and the treating physicians. The ALJ based this RFC on those opinions as well as the other evidence of record, including Plaintiff's testimony. For these reasons, the undersigned finds the ALJ's decision

to assign great weight to these opinions is supported by substantial evidence and recommends her decision be affirmed.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).